**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Darryl Wayne CAMPBELL,**
**Defendant–Appellant.**

**No. 90–2148.**

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1991.

Stanley G. Schneider, Schneider & McKinney, Houston, Tex., for defendant-appellant.

Jeffery A. Babcock, Paula C. Offenhauser, Asst. U.S. Attys., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before THORNBERRY, JOLLY and SMITH, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this drug case, federal officers were engaged in surveillance of a known drug trafficker, Darryl Wayne Campbell. The surveillance resulted in a high speed chase, a collision, and an arrest. This appeal primarily requires us to consider whether Campbell's arrest *for cocaine possession* was lawful, with Campbell contending that the cocaine was not discovered until after his arrest. We conclude that the arrest was lawful. The district court thus committed no error in denying Campbell's suppression motion, and we affirm his conviction and his sentence.

## I

Acting on information that Campbell was distributing large quantities of drugs, federal agents followed Campbell when he left a car dealership in Houston, Texas, on February 2, 1989, accompanied by a young woman and an unknown man. The threesome drove to Houston's, a nearby trendy restaurant, and later returned to the car dealership. After approximately half an hour, Campbell and the woman left the dealership in Campbell's truck and stopped for gas before travelling to Papa's Garage. Daniel Morales, the owner of Papa's Garage, was reputed to be directly connected with cocaine-distributing entrepreneurs in South America and a wholesaler or a warehouseman for the illicit drug. The agents did not expect Campbell to visit Morales, whom they believed was Campbell's drug supplier, and viewed this turn of events as fortuitous.

When Campbell arrived at Papa's Garage, he drove his truck into the interior of the building where he could not be seen. Within a short time, a few men came from the garage to stand on the outside. Five minutes later, Campbell drove his truck out of the garage and onto the street. As Campbell turned into the street, he made direct eye contact with Michael Statlander, an agent for the Drug Enforcement Administration ("DEA"), who then immediately concluded that the surveillance had been compromised. Agent Statlander and the other federal agents decided to follow Campbell anyway.

Campbell, however, immediately began changing traffic lanes. The government argued at the suppression hearing that these movements constituted evasive driving actions that served no purpose other than to identify members of the surveillance team. At some point, Agent Statlander pulled up directly behind Campbell at a stop light in an unmarked car and observed Campbell looking into his side- and rear-view mirrors. Agent Statlander then unsuccessfully hand-motioned to Campbell to pull his truck over to the side of the road. Campbell, however, refused to yield and accelerated his truck to 100 m.p.h. Agent Statlander tried to stay behind Campbell, as did other members of the surveillance team, some of whom were driving vehicles equipped with lights and sirens.

After a high speed chase, the federal authorities cornered Campbell on a dead-end street, where he was forced to stop after colliding with an agent's car. Agent Statlander testified that he intended to arrest Campbell at this time because his reckless driving posed a threat to public safety. At some point, however, Statlander was informed that Campbell possessed cocaine and arrested him for drug possession.

The exact moment of Campbell's arrest is the subject of dispute because the agents did not discover that Campbell possessed cocaine in his truck until the young woman

in the truck jumped out of the passenger seat and threw an uncovered box containing two kilograms of the drug in the agents' plain view. The government, of course, contends that Campbell was arrested *after* the box of cocaine had been found. Campbell contends otherwise. The district court, we assume, accepted the government's view of the sequence of events. We make this assumption because the court orally denied Campbell's motion to suppress the cocaine, although it failed to render any written findings on this question. All parties agree, however, that after Campbell's arrest, officers saw in plain view a nine-millimeter firearm lying on the front seat of the truck.

We pretermit any procedural discussion of this case since it is irrelevant to the main issue before us on appeal. Suffice it to say that Campbell entered a conditional guilty plea to possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). *See* Rule 11(a)(2), Fed. R.Crim.P.

## II

Campbell contends that his arrest was unlawful: first, because the only crimes that the federal officers had probable cause to believe he had committed were local traffic offenses, which they were not authorized to enforce, Tex.Rev.Civ.Stat.Ann. art. 6701d § 143A(a) (Vernon 1977) (classifying traffic law violations as misdemeanors); Tex.Code Crim.Proc. Ann. § 2.122 (Vernon Supp.1991) (granting federal agents, *inter alia*, powers to arrest for felony offenses only); and second, there was no probable cause for the arrest based on cocaine possession at the time the arrest occurred because the cocaine was not discovered until after he was placed under arrest. Campbell thus argues that the district court erred in denying his motion to suppress the cocaine obtained as the result of these unlawful seizures.

■ We conclude that the district court did not err. Our review of the evidence establishes that at the time of the stop, the agents had a reasonable suspicion that a drug-related crime was being committed. *See United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Campbell was a well-known cocaine dealer. He visited Papa's Garage, the business of a man that the agents believed to be a major conduit of South American drugs and with whom agents knew Campbell had had prior contacts. He drove his truck into the interior of Papa's Garage where he could not be observed by others. While he was inside the garage, several individuals came from the garage and began looking up and down the street. He stayed in the garage for only a short period of time. Agent Statlander testified at the suppression hearing that it was his opinion, based on his experience and training as a law enforcement agent, that Campbell's conduct at Papa's Garage was consistent with a covert drug transaction. In addition, when Agent Statlander hand-motioned to Campbell to stop his truck, Campbell immediately began driving erratically and at speeds up to 100 m.p.h. in order to evade the law enforcement officers, with reckless disregard for public safety. We thus easily conclude that the agents had reasonable suspicion that some drug-related crime was occurring, and that the officers had a lawful right to detain Campbell to make appropriate inquiries. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ We also conclude that once they stopped Campbell, they were certainly entitled to take action to protect their safety before attempting to effectuate a formal arrest. *See United States v. Colin*, 928 F.2d 676 n. 2 (5th Cir.1991) (noting that for safety reasons, officer would have been justified in handcuffing defendant before formally arresting him). Campbell had just collided with an agent's car after being cornered on a dead-end street at the conclusion of the high-speed chase. Agent Statlander, the arresting officer, testified that he was afraid that Campbell would still attempt to escape by assaulting the agents with his truck. Therefore, to secure the safety of all officers, Agent Statlander

pulled Campbell out of the vehicle, threw him to the ground, and patted down his outer clothing for weapons. At the same time, another agent, apparently also feeling the danger of the situation, drew his gun at the front of Campbell's truck.

■ Almost simultaneously with Agent Statlander's removing Campbell from the truck and forcing him to the ground, another agent called out that a box of cocaine had just been thrown out from the passenger side of the truck. At this point, Statlander informed Campbell that he was under arrest for possession of cocaine.[1]

Although Campbell argues that Statlander testified at the suppression hearing that he arrested Campbell *before* learning about the discovery of cocaine, our review of his testimony does not support this contention. Campbell insists that the following testimony by Agent Statlander supports his position about the timing of his arrest:

Q What happened after [Campbell's] car was stopped?

A I went directly to the truck and took Mr. Campbell out of the driver's seat.

Q When you got him out of the car, did you tell him he was under arrest?

A At that point I did, yes.

Later at the same hearing, however, Agent Statlander testified, as follows:

Q You went to approach [Campbell's] truck and got him out?

A Correct.

Q What did you do with Mr. Campbell at [that] point?

A I took him out of the truck and put him down on the ground, patted him down for any weapons.

Q After you patted him down, do you know what Agent Jackson was doing?

A Well, I was informed that a box was thrown out of the truck when the passenger door was opened and the box, which had no top on it, had two kilos of cocaine. That's what I was told.

. . . .

Q After the cocaine was discovered, what did you say to Mr. Campbell?

A That he was under arrest for the cocaine, possession of the cocaine.

We discern no inconsistency in these two excerpts from Statlander's testimony, his latter testimony being more specific about the sequence of events than the former. Although it is certainly true that Agent Statlander arrested Campbell after forcing him out of his truck, when speaking in specifics it is also clear that he did so only *after* discovering the cocaine. Thus, we find no error in the district court's denial of Campbell's suppression motion because it is clear that once the cocaine was discovered, Agent Statlander had sufficient probable cause to arrest Campbell for drug possession.

### III

Based on the foregoing reasons,[2] the judgment of the district court is

AFFIRMED.

**1.** We realize that Agent Statlander stated at the suppression hearing that he intended to arrest Campbell as soon as Campbell had begun driving erratically to evade the officers. According to Agent Statlander, he would have been justified to arrest Campbell at that point because by driving 100 m.p.h. and refusing to stop at any traffic lights or stop signs, Campbell posed a serious threat to public safety. We note, however, that Agent Statlander did not in fact arrest Campbell for these misdemeanor traffic offenses. Moreover, his uncommunicated subjective intent is wholly irrelevant to a Fourth Amendment inquiry. *See United States v. Men-* *denhall,* 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1877 n. 6, 64 L.Ed.2d 497 (1980).

**2.** After carefully reviewing the remaining issues presented on appeal, we have determined that none are sufficiently meritorious to warrant full discussion. We therefore summarily dispose of these as follows:

Campbell argues that the government engaged in "outrageous conduct" and thus that he is entitled to acquittal under the due process clause of the Fifth Amendment. *See United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36

L.Ed.2d 366 (1973). The thrust of Campbell's complaint is that the government agreed to dismiss all charges against him if he provided sufficient information about his superiors in the drug distribution chain but refused to do so after he fulfilled his end of the bargain at substantial risk to his own safety. This argument fails for two reasons. First, the record amply supports the district court's implicit finding that the government did not agree to dismiss the charges, but only to make the extent of Campbell's cooperation known to the sentencing judge. Second, even if the agreement required the government to dismiss the charges, the government did not engage in outrageous conduct in breaching its promise to do so. *See United States v. Yater,* 756 F.2d 1058, 1066 (5th Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985) (due process violation found only in rarest and most outrageous circumstances).

Campbell next argues that the district court should have dismissed his indictment because he was arrested on February 2, 1989, and indicted 84 days later on April 24, 1989, in violation of the Speedy Trial Act, 18 U.S.C. § 3161(b). It is clear, however, that Campbell's arrest on February 2, 1989, did not trigger the proscriptions of § 3161(b). *See United States v. Johnson,* 815 F.2d 309, 312 (5th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988).

Campbell insists that the district court erred in refusing to hold an evidentiary hearing to determine whether he was entitled to a downward departure from the federal sentencing guidelines based upon the substantial assistance he provided to the government in his role as drug informant. Under 18 U.S.C. § 3553(e) and § 5K1.1 of the federal sentencing guideline,

however, a motion by the government is a prerequisite to any downward departure from the statutorily-required minimum sentence. *See United States v. White,* 869 F.2d 822 (5th Cir.) (noting that motion requirement is predicated on reasonable assumption that government is in best position to provide accurate report of defendant's assistance), *cert. denied,* 490 U.S. 1112, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989). In this case, however, the government refused to file such a motion because, in its view, Campbell did not provide substantial assistance. Thus, the district court did not err in refusing to hold an evidentiary hearing on the matter. Moreover, we need not decide whether the district court should have considered a downward departure even in the absence of a § 5K1.1 motion because it is clear that despite any good faith effort on Campbell's part, he did not provide substantial assistance.

Campbell also contends that the government breached the plea agreement and thus that his guilty plea was involuntary. Because Campbell raises this claim for the first time on appeal, the issue is deemed waived. *See United States v. Jackson,* 700 F.2d 181, 190 (5th Cir.), *cert. denied,* 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983).

Finally, Campbell argues that § 5K1.1 of the federal sentencing guidelines and its progenitor, 18 U.S.C. § 3553(e), unconstitutionally deprived him of due process of law by delegating unfettered discretion to prosecutors to decide who is entitled to a sentence reduction. This challenge is foreclosed by our decision in *United States v. Harrison,* 918 F.2d 30, 33 (5th Cir.1990), in which we expressly held that the government-motion requirement does not violate due process.